

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GENERAL AUTO SERVICE STATION, an Illinois corporation, F.A.Y. PROPERTIES, INC., an Illinois corporation, and COSMOPOLITAN BANK AND TRUST, SUCCESSOR TO THE COSMOPOLITAN NATIONAL BANK OF CHICAGO, not individually but as trustee under agreement dated December 21, 1994 and known as trust # 27340,<br><br>    Plaintiffs,<br><br>v.<br><br>The CITY OF CHICAGO, a municipal corporation, and LAMAR ADVERTISING COMPANY, a Delaware corporation, of itself and d/b/a Lamar Whiteco Outdoor Corporation,<br><br>    Defendants. | No. 00 C 0368<br><br>Judge Rebecca R. Pallmeyer |

## MEMORANDUM OPINION AND ORDER

Plaintiffs General Auto Service Station, F.A.Y. Properties, Inc., ("F.A.Y."), and Cosmopolitan Bank and Trust, Successor to the Cosmopolitan National Bank of Chicago ("Cosmopolitan Bank"), brought this suit against Defendants the City of Chicago (the "City") and Lamar Advertising Company ("Lamar") to resolve a dispute regarding a sign painted on an exterior wall of a building located at 1127-33 North State Street in Chicago, Illinois. The City determined that the sign, which has existed in its current location and near its current size for over 40 years, violates the City's Zoning Ordinance and must be removed. Plaintiffs claim that the ordinance is unconstitutional as applied to their property under the Fourteenth Amendment due process clause, and seek declaratory and injunctive relief allowing them to maintain the sign in its present condition. The court held a bench trial on these issues and now enters judgment in favor of the City.

## BACKGROUND

The facts of this case as presented in this court's May 21, 2001 and March 9, 2004 Memorandum Opinions and Orders, see *General Auto Service Station v. City of Chicago*, No. 00 C 368, 2001 WL 558148 (N.D. Ill. May 21, 2001) and *General Auto Service Station v. City of Chicago*, No. 00 C 368, 2004 WL 442636 (N.D. Ill. Mar. 9, 2004), and in the Seventh Circuit's decision in *General Auto Service Station LLC v. City of Chicago*, 319 F.3d 902 (7th Cir. 2003), were largely undisputed and confirmed at trial. This opinion assumes the reader's familiarity with these earlier decisions.

### A. The Parties

In January 1961, Bernard Heerey purchased property located at 1127-33 North State Street in Chicago, Illinois (the "Property"). Plaintiff Cosmopolitan Bank currently holds legal title to the Property under a trust agreement dated December 21, 1984, known as trust #27340 (the "Land Trust"). In 1998, Heerey assigned his beneficial ownership in the Property to Plaintiff General Auto Service Station, an Illinois corporation that later merged with and into General Auto Service Station, LLC ("General Auto"). General Auto is the beneficial owner of the Land Trust. Plaintiff F.A.Y. is an Illinois corporation that acts as an agent for General Auto. (UF ¶¶ 2-6.)[1]

Prior to Heerey's death in February 1999, he wholly owned both General Auto and F.A.Y. The two entities are now wholly owned by the Estate of Bernard A. Heerey. Heerey's estate is still in probate and attorney Nathaniel Grey, a partner in the law firm representing Plaintiffs in this case, is serving as executor. Heerey also designated Grey as the trustee of a charitable trust holding, with some exceptions not relevant here, the assets of Heerey's estate. Grey is the current President and Manager of General Auto. (*Id.* ¶¶ 7-10.)

---

[1] The parties' Statement of Uncontested Facts is cited as "UF ¶ ___."

From 1959 until Heerey's death, Grey actively represented Heerey in legal matters and was very familiar with Heerey's commercial real estate business. (Tr. 52-53.) Grey testified that Heerey essentially treated Grey's office as his own, and that Grey's office manager, Lillian Licheniak, performed secretarial and bookkeeping services for Heerey. In fact, when Grey wanted to give Heerey a copy of a document or letter, Lillian would place it in a pile for Heerey to read when he came to the office. Grey utilized this method of communication "with all letters involving him [Heerey] and all memos," and Grey believes that Heerey read everything Grey set aside for him. (Tr. 54-55.) In addition, Grey personally spoke with Heerey on a regular basis and kept him informed about "[e]verything involving his [Heerey's] work, his matters," including his properties. (Tr. 55.)

## B. The Wall Sign

Heerey first had a sign painted on the south exterior wall of the Property (the "Wall Sign") in 1962. It is undisputed that he did not seek or obtain a permit from the City prior to having the Wall Sign painted. The parties disagree as to whether such a permit was required at that time pursuant to section 8.9(5) of the Chicago Zoning Ordinance or Chapter 86.1 of the Chicago Electrical Code, discussed in detail below. (*See* 1962 Zoning Ordinance § 8.9(5); Chicago Elec. Code § 86.1-4(a) (1962); Chicago Building Code § 61-2 (1962).) At some point between 1962 and 1969, Heerey hired a company called Buck Electric to install lights near the roof line of the Property to illuminate the Wall Sign. (*Id.* ¶¶ 11-13.) Plaintiffs believe that Heerey obtained a permit for the lights as required by Chapter 86.1 of the Electrical Code, but the City denies such a claim and no permit was introduced at trial. (Chicago Elec. Code § 86.1-4(a) (1962).) During the 1960s and 1970s, the Wall Sign consisted of two smaller signs. By 1979, however, the Wall Sign was expanded to its current size – approximately 26 feet high and 59 feet wide – and has been in place, at that size, ever since. (*Id.* ¶¶ 14, 18, 22.)

3

The parties agree that the Wall Sign has at all relevant times been an "advertising sign" as that term is defined in the Chicago Zoning Ordinance (the "Zoning Ordinance"), and has been located in a B4-5 zoning district.[2] The Wall Sign has always been within 75 feet of a residence zoning district, but has never been within 75 feet of any residential building located in a residence zoning district. (*Id.* ¶¶ 15, 16, 19.)

## C. Leasing History

In 1979, Heerey leased the surface of the south exterior wall of the Property (the "Wall Space") to outdoor advertising company Foster and Kleiser, which expanded the Wall Sign to its current size a few months later. Foster and Kleiser stopped leasing the Wall Space in early 1985,[3] and on March 20, 1985, Heerey entered into a new lease for the space with Outdoor Media, Inc. (*Id.* ¶¶ 22, 23; http://www.clearchanneloutdoor.com/corp/history/default.asp.) Shortly thereafter, Whiteco Industries, Inc. ("Whiteco")[4] purchased Outdoor Media and assumed its lease with Heerey. Between 1985 and 1997, Whiteco and Heerey entered into a number of successive leases for the Wall Space. Some time after they entered the last of their lease agreements, Chancellor Media Corporation ("Chancellor") purchased Whiteco and assumed its lease with Heerey. (*Id.* ¶¶ 24, 25.)

In 1998, Heerey assigned his interest in the Wall Space lease with Whiteco to F.A.Y. In August 1999, F.A.Y. leased the Wall Space to Chancellor, then doing business as "Chancellor Media Whiteco Outdoor Corporation." The following month, Lamar Advertising Company purchased

---

[2] The parties do not define a B4-5 zoning district or describe its significance. Pursuant to a new Ordinance effective on November 1, 2004, the district in which the Wall Sign is located is now known as a DX-7 zoning district, and the Wall Sign is now defined as an "off-premises" sign. (UF ¶ 15.) The parties have not explained the significance of these changes.

[3] The parties do not explain how Foster and Kleiser's relationship with Heerey came to an end.

[4] Sometime prior to August 1997, Whiteco Industries, Inc. became known as Whiteco Outdoor Advertising. (UF ¶¶ 40, 41.) For purposes of this opinion, the court will refer generally to "Whiteco."

4

Chancellor and assumed its August 1999 lease with F.A.Y. Lamar is the current lessee of the Wall Space. (*Id.* ¶¶ 26-29.)

D. **The Violation Notices**

1. **The 1984 Violation Notice**

Prior to 1990, section 8.9(7) of the Zoning Ordinance provided that "[n]o advertising sign shall be permitted within 75 feet of any property in a Residence District." (1962 and 1976 Zoning Ordinances § 8.9(5).) On September 3, 1986, while this pre-1990 version of the Zoning Ordinance was in effect, the City issued a Notice of Violation for the Wall Sign to Heerey's property management company, Storich & Company. This 1986 Violation Notice stated that the Wall Sign was installed without a permit in violation of "Chapter 86.1" of the Chicago Electrical Code dealing with "Electric Signs and Signboards." (UF ¶¶ 30, 31; DX 1.) On September 6, 1986, Nathaniel Grey forwarded the Violation Notice to Jeffrey Berg of Whiteco, the lessee of the Wall Space at that time. (Letter from N. Grey to J. Berg of 9/10/86, DX 1.) Sometime thereafter, Grey received a copy of a hearing notice issued by the City's Electrical Compliance Officer. Grey wrote in the margin of the notice, "Whiteco is supposed to be handling." (Tr. 64-65.)

Whiteco did in fact retain attorney Thomas T. Murphy to handle the Violation Notice, and on April 7, 1987, Berg advised Grey of that fact. (Letter from J. Berg to N. Grey of 4/7/87, DX 6.) Two days later, on April 9, 1987, Grey sent Berg a letter stating that "I don't quite understand the 75-foot distance requirement from property in a residential district," and noting that there was no improved property within 75 feet of the sign, "just a vacant lot." (Letter from N. Grey to J. Berg of 4/9/87, DX 7.) Regardless, Grey testified that he spoke with Heerey about the Violation Notice and kept him informed of the situation. (Tr. 61-63.) For reasons not explained in the record, the City did not ultimately pursue this Violation Notice, nor did it ask that the sign be removed. (Pl. Br. ¶ 32.)[5]

---

[5] Plaintiffs' Post Trial Brief and Final Argument is cited as "Pl. Br. ¶ __."

5

### 2. The 1994 Violation Notice

In 1990, the City amended section 8.9(7) of the Zoning Ordinance to state that "[n]o advertising sign having a face which exceeds 100 square feet shall be permitted within 250 feet of a Residence District. No advertising sign shall be permitted within 75 feet of a Residence District." (1990 Zoning Ordinance § 8.9(7).) The parties agree that as of 1990, the Wall Sign did not comply with section 8.9(7) because it is an advertising sign which exceeds 100 square feet and is located within 250 feet of a Residence District. Plaintiffs argue, however, that the City should allow the non-conforming Wall Sign to remain in place indefinitely pursuant to the Zoning Ordinance's "grandfather clause," which at all relevant times provided that:

> Any sign that does not conform to Section[] . . . 8.9(7) . . . of this chapter, as amended by this ordinance, and that was lawfully erected pursuant to a permit lawfully issued prior to the effective date of this section, may remain in use as a legal non-conforming sign.

(Pl. Br. ¶ 35; 1990 Zoning Ordinance § 6.7-1(a).) In Plaintiffs' view, the Wall Sign qualifies as a legal non-conforming use because it was never located within 75 feet of "any property" in a Residence District as contemplated by the pre-1990 version of section 8.9(7). Specifically, the Wall Sign is positioned on a building that stands adjacent to a parking lot and, thus, was never within 75 feet of any residential building located within the Residence District. The City insists that Plaintiffs' definition is overly narrow and argues that the parking lot itself constitutes "property" in a Residence District sufficient to trigger the 75-foot restriction.

In any event, it is undisputed that on September 29, 1994, the City issued Heerey a Notification of Violation of the Zoning Ordinance. The Violation Notice stated that the Wall Sign violated section 8.9(7) of the Zoning Ordinance because it exceeds 100 square feet and is located within 250 feet of a Residence District. (UF ¶¶ 32, 33; PX 1.) On October 5, 1994, Grey sent a letter to Jack Ayers of Whiteco, which remained the lessee of the Wall Space at that time, enclosing a copy of the Violation Notice and directing Whiteco to "[p]lease handle it." Grey copied Heerey on

6

that letter. (Letter from N. Grey to J. Ayers of 10/5/94, DX 10.) In response to the letter, Whiteco submitted a sign permit application to the City on December 20, 1994 (the "1994 Application"). (*Id.* ¶¶ 34, 35.) On January 12, 1995, William Merritt, an employee of the City's Zoning Department, approved the application as a "legal non-conforming" use and stamped it as "conforms to zoning." (*Id.* ¶ 36; PX 2; Tr. 83-84.) According to Merritt, however, his approval did not formally render the Wall Sign valid under the Zoning Ordinance. Instead, Merritt testified that once an application is marked legal, non-conforming, "[t]he normal process is that it is given to the [B]uilding [Department's] electrical section for their review." (Tr. 86.)

Consistent with this additional review process, Whiteco submitted the 1994 Application for further processing by the City on January 31, 1995.[6] On April 12, 1995, Whiteco wrote to Burton Natarus, the City Alderman for the ward in which the Property is located, requesting a City Council order for a sign permit for the Wall Sign.[7] (UF ¶ 37.) Also on April 12, 1995, Whiteco Real Estate Manager William P. Schmelter wrote a letter to Dan Allen of the City's Electrical Inspections Section enclosing a Sign Permit Application. (Letter from W. Schmelter to D. Allen of 4/12/95, DX 11.) One week later on April 19, 1995, the City's Department of Buildings issued a Plan Correction Sheet – a document that, according to Thomas P. Smith, the City's Acting Zoning Administrator, "instruct[s] applicants as to problems or issues with their applications, things that generally need to be corrected" (Tr. 133) – stating that the application for the 1127 North State Street property required a copy of a City Council order approving the Wall Sign.[8] (Plan Correction Sheet of 4/19/95, DX 12.)

---

[6] Neither party submitted a copy of the documentation submitted to the City in January 1995 or indicated to whom the documentation was addressed.

[7] Again, the parties did not submit a copy of the letter to Alderman Natarus.

[8] The Plan Correction Sheet is not addressed to anyone in particular and it is not clear who received a copy of it. The court notes, however, that the document was produced during discovery by Lamar Advertising, which in September 1999 purchased Chancellor, then doing business as "Chancellor Media Whiteco Outdoor Corporation." (Tr. 134-35.) It is thus reasonable to assume that Whiteco received a copy of the Plan Correction Sheet sometime prior to September

7

It is undisputed that Whiteco never obtained such a City Council order and that the City never issued a permit for the Wall Sign in response to the 1994 Application. (UF ¶¶ 38, 39.) There is no evidence, however, that the City formally denied the 1994 Application.

### 3. The 1997 Violation Notice

Nothing further happened with respect to the Wall Sign until August 22, 1997 when the City issued a Notice of Violation stating: "Obtain permit for outdoor flat building sign installed without permit. (14-40-040)." (UF ¶ 40; 1997 Notice of Violation, PX 3.) Section 14-40-040 of the Municipal Code (now Section 13-20-550 of the Municipal Code) provides that

> It shall be unlawful to begin the erection, alteration or enlargement of any sign, signboard or structure covered by the provisions of this chapter of the code unless a permit therefor shall have first been obtained from the department of inspectional services.

(Municipal Code § 14-40-040.) On September 15, 1997, Grey sent William Schmelter of Whiteco a letter, copied to Heerey, enclosing a copy of the 1997 Violation Notice and asking Schmelter to confirm that Whiteco would be handling the matter. (*Id.* ¶ 42; Letter from N. Grey to W. Schmelter of 9/15/97, DX 14.) Shortly thereafter on September 30, 1997, Whiteco appeared as the respondent at an administrative hearing on the Violation Notice. At that hearing, Whiteco[9] admitted to a "violation of the Chicago Building Code" as charged in the Violation Notice and the hearing officer entered a finding to that effect. Rather than assess a fine against Whiteco, the hearing officer afforded it an "opportunity of mitigation via compliance. Compliance must be evidenced by reinspection and/or other evidence corroborating conditions." (*Id.* ¶¶ 43-45; Findings, Decision and Order of 9/30/97, PX 4.)

---

1999.

[9] The admission line on the Findings, Decision and Order is signed by someone named Cynthia, last name illegible. The parties do not indicate her relationship to Whiteco.

8

On April 16, 1998, Whiteco filed a sign permit application with the City, again seeking a permit for the Wall Sign. (*Id.* ¶ 46; 1998 Sign Permit Application, PX 5.) The Zoning Administrator denied the application on April 21, 1998, finding that the Wall Sign violated section 8.9(7) of the Zoning Ordinance. Specifically, the Zoning Administrator noted that the Wall Sign "exceeds 100 square feet and falls within 250 feet of a residential zoned district and is not permitted and there is no previous sign permit on file." (*Id.* ¶ 47; Official Denial of Zoning Certification of 4/21/98, PX 6.) As a result of this finding, the City did not issue a permit in response to the 1998 application. (*Id.* ¶ 48.) On June 5, 1998, Whiteco appealed the decision of the Zoning Administrator to the Zoning Board of Appeals ("ZBA"), which affirmed the decision on September 14, 1998. (*Id.* ¶¶ 49, 50; Zoning Board of Appeals notice of 9/14/98, PX 8.) The ZBA found that "no evidence was presented to indicate that the subject sign is located a minimum 250 feet or more away from a Residence District," and that "under Section 8.9(7) of the zoning ordinance the Board has no authority to permit the said advertising sign at the subject site." (Zoning Board of Appeals notice of 9/14/98, PX 8.)

On October 19, 1998, Whiteco filed a complaint in the Circuit Court of Cook County, Illinois, captioned *Whiteco Outdoor Advertising v. City of Chicago Zoning Board of Appeals, et al.*, No. 98 CH 14280, seeking administrative review of the ZBA decision (the "Administrative Review Action"). (*Id.* ¶ 51.) The next day on October 20, 1998, an Administrative Law Officer with the City's Department of Administrative Hearings imposed a $250 fine and ordered Whiteco to "obtain permit for electrical sign or remove same within 90 days hereof." (Findings, Decisions & Order of 10/20/98, PX 9.) On December 29, 1999, Plaintiffs presented a joint petition to intervene in the Administrative Review Action, which the Circuit Court denied. The City did not appear in court for that proceeding. (UF ¶ 52.)

On March 2, 2000, the Circuit Court denied Whiteco's request for relief on its claim for administrative review, and the Illinois Appellate Court affirmed the decision on September 17, 2001. (*Id.* ¶¶ 53, 54.) *See Whiteco Outdoor Advertising v. City of Chicago Zoning Bd. of Appeals*, 324 Ill.

9

App. 3d 1142, 805 N.E.2d 757 (Table) (1st Dist. 2001). Whiteco's Petition for Leave to Appeal to the Illinois Supreme Court was denied on February 6, 2002. (*Id.* ¶ 55.) *See Whiteco Outdoor Advertising v. City of Chicago Zoning Bd. of Appeals*, 198 Ill. 2d 610, 766 N.E.2d 245 (Table) (2002).

### E. Plaintiffs' Lawsuit

Plaintiffs filed this lawsuit on January 19, 2000 alleging substantive and procedural due process violations and a violation of their right to free speech. This court dismissed the complaint under the *Younger* abstention doctrine, *see General Auto Service Station*, 2001 WL 558148, at *2-4, but the Seventh Circuit reversed. *See General Auto Service Station*, 319 F.3d at 904-07. On April 29, 2003, Plaintiffs filed a First Amended Complaint ("Complaint"), which the court dismissed in part on March 9, 2004. *See General Auto Service Station*, 2004 WL 442636. Plaintiffs presented two surviving substantive due process claims at a bench trial before this court on December 20, 2004: (1) the City's zoning ordinance is unconstitutional as applied to Plaintiffs' property because it exceeds the police powers of the City and denies due process of law, and (2) the City's zoning ordinance has been unconstitutionally applied in a harsh, oppressive, and arbitrary manner in violation of Plaintiffs' due process rights. 42 U.S.C. § 1983. Having heard and reviewed all the testimonial and documentary evidence in this case, the court is now prepared to rule on these claims.

### DISCUSSION

Plaintiffs argue that they have established their substantive due process claims under 42 U.S.C. § 1983 because the Wall Sign is "a vested property right or interest created under state law that the City is threatening to take away in an arbitrary and irrational manner." (Pl. Br. ¶ 50.) In Plaintiffs' view, the Wall Sign is entitled to legal, non-conforming status and the City's refusal to recognize such status is unconstitutional. (*Id.*) (citing *Sanderson v. DeKalb County Zoning Bd. of Appeals*, 24 Ill. App. 3d 107, 110, 320 N.E.2d 54, 57 (2d Dist. 1974) ("A non-conforming use is a

property right which if taken away in an unreasonable manner, or in a manner not grounded on public welfare, should be invalid.")) The City denies that the Wall Sign qualifies as a legal, non-conforming sign, and insists that Plaintiffs' § 1983 claims are untimely in any event.

I. **Statute of Limitations**

The City contends that Plaintiffs' substantive due process claims fail because Plaintiffs did not file this lawsuit within the applicable two-year statute of limitations. *See Hoosier Bancorp of Indiana, Inc. v. Rasmussen*, 90 F.3d 180, 182 (7th Cir. 1996) (citing *Wilson v. Garcia*, 471 U.S. 261, 275, 280 (1985)) ("§ 1983 claims are best characterized as personal injury actions."); *Clark v. City of Braidwood*, 318 F.3d 764, 766 (7th Cir. 2003) ("The limitations period for § 1983 cases in Illinois is two years.") The City previously raised this issue in its motion to dismiss the First Amended Complaint, arguing that the alleged deprivations of Plaintiffs' vested right to keep the Wall Sign in its current location are based on the Violation Notices issued by the City in 1995 and 1997, and that Plaintiffs' January 2000 lawsuit was untimely. *General Auto Service Station*, 2004 WL 442636, at *5-6. This court rejected the City's argument at that time because though the City had issued a Violation Notice in 1994 and had failed to grant Whiteco's 1994 permit application, the City nonetheless took no further action to enforce the zoning ordinance at that time. *Id.* at *9. Thus, the City's issuance of a second Violation Notice in 1997

> arguably did not put Plaintiffs on notice that the City intended to enforce the zoning ordinance in an allegedly unfair manner. In fact, the first time the City actually did enforce a violation notice to Plaintiffs' detriment was either on April 21, 1998, when the Zoning Administrator denied Whiteco's permit application, or on October 20, 1998, when an administrative law officer assessed the $250 fine.

*Id.* The court also noted that "Plaintiffs did not learn that the City was allegedly wrongfully prohibiting their sign until it denied Whiteco's permit application on April 21, 1998." *Id.*

The City's primary argument on this issue post-trial is that the evidence now establishes that Heerey and his attorney, Grey, both knew that the City "did not issue a permit in response to

11

Whiteco's 1994 sign permit application more than two years before this lawsuit was filed." (City Br., at 4; Tr. 55, 66.)[10] In the City's view, Plaintiffs knew or should have known by September 15, 1997, the date Grey forwarded the 1997 Violation Notice to Whiteco, that their rights had been allegedly violated by the City's failure to issue a permit back in 1994. (*Id.* at 3.) The court agrees.

Plaintiffs claim that the City acted irrationally and arbitrarily by allowing legal, non-conforming advertising signs to remain in place indefinitely if they were erected "pursuant to a permit lawfully issued," but not if the sign lawfully existed before a permit was required. (Pl. Br. ¶ 52.) William Merritt stamped the permit application as a legal, non-conforming use in January 1995, but the City never issued a permit, which ultimately led to the 1997 Violation Notice, stating: "Obtain permit for outdoor flat building sign installed without permit. (14-40-040)." (UF ¶ 40; 1997 Notice of Violation, PX 3.) On this record, the court agrees with the City that the 1997 notice should have put Plaintiffs on notice that the City would not allow the purportedly legal, non-conforming Wall Sign to remain in place in the absence of a permit. Though the Zoning Administrator did not officially deny Whiteco's 1998 permit application until April 21, 1998, Plaintiffs knew the circumstances that support the claim they are presenting here – i.e., the differential treatment of permitted and non-permitted legal, non-conforming signs – by September 1997. Plaintiffs did not file this lawsuit until January 2000 and, thus, their § 1983 claims are untimely. In light of the City's extended delays in enforcing the Zoning Ordinance, the court nevertheless addresses the substantive merits of Plaintiffs' claims, as well.

## II. Substantive Due Process

"[W]hen a plaintiff's substantive due process claim is predicated on the deprivation of a state created property interest, the plaintiff must show (1) that the state actor's conduct was arbitrary and irrational, and (2) that the state actor committed a separate constitutional violation *or* that state law

---

[10] Defendant City of Chicago's Post-Trial Brief is cited as "City Br., at __."

remedies are inadequate." *Galdikas v. Fagan*, 342 F.3d 684, 691 (7th Cir. 2003). Plaintiffs claim that they have established violations of their substantive due process rights because the City's policy regarding permitted and non-permitted legal, non-conforming signs is arbitrary and irrational, and because the Wall Sign was at all relevant times such a legal, non-conforming sign.

## A. Legal, Non-Conforming Use

To prevail on their due process claims, Plaintiffs must first demonstrate that the Wall Sign has legal, non-conforming status under the Zoning Ordinance's grandfather clause. If not, then the Wall Sign, which was not erected pursuant to a permit, violates the ordinance as argued by the City. As explained in the court's earlier opinions, Plaintiffs' situation was, on its face, troubling; it appeared that the City ordinances "grandfathered in" a non-conforming sign so long as it was erected pursuant to a permit, but did not grant that status to signs erected at a time when no permit of any kind was required. As of November 1, 2004, the ordinance has been amended in such a way as to satisfy this concern. Specifically, the City replaced section 6.7-1(a) of the Zoning Ordinance with sections 17-15-0502 and 17-15-0503, which eliminated the requirement for a permit:

> 17-15-0502 Definition
> A nonconforming sign is a sign that was lawfully established, in accordance with zoning and other sign regulations in effect at the time of its establishment but that is no longer allowed by the regulations of this Zoning Ordinance.
>
> 17-15-0503 Continuation of Nonconforming Signs
> Nonconforming signs may remain in use, subject to the regulations of this Section (Section 17-15-0500) and all other applicable requirements of the Municipal Code.

In any event, the court turns to whether the Wall Sign constitutes a legal, non-conforming use under the grandfather clause in effect prior to November 1, 2004.

### 1. 1962

#### a. Section 8.9(5)

Plaintiffs claim that the Wall Sign was lawfully erected in 1962 under all relevant provisions of the Zoning Ordinance and Municipal Code. First, Plaintiffs contend that the Wall Sign complied

13

with section 8.9(5) of the Zoning Ordinance in effect at that time because it was never within 75 feet of "any property in" a Residence District. (1962 and 1976 Zoning Ordinances § 8.9(5).) In Plaintiffs' view, the term "any property" means a building within a Residence District, and the parties agree that the Wall Sign was never located within 75 feet of any residential building within a Residence District. The City denies that the term "any property" is limited to property improved by a residential building, and argues that the Wall Sign's location within 75 feet of a vacant parking lot that was itself within a Residence District suffices to bring the sign within section 8.9(5) of the Zoning Ordinance.

"A zoning ordinance is in derogation of common-law rights to the use of property and should be strictly construed in favor of the right of the property owner to the unrestricted use of the property." Constantine v. Village of Glen Ellyn, 217 Ill. App. 3d 4, 16, 575 N.E.2d 1363, 1371 (2d Dist. 1991). At the same time, "[i]t is well established that where the statute's language is plain, the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms." United States v. Jones, 372 F.3d 910, 912 (7th Cir. 2004) (quoting Lamie v. United States Trustee, 540 U.S. 526 (2004)). Plaintiffs dispute that the language of section 8.9(5) is plain, noting that Paul Woznicki, the City's former Zoning Administrator, testified that the provision "was a little bit confusing to me in that if it was – I didn't know where the line would be drawn if you had – did it mean the property line or did it mean the building on a residential property?" (Tr. 92.) According to Woznicki, the 1990 amendment to the Zoning Ordinance eliminating the term "any property in" made it easier to enforce the ordinance by setting "a hard line" that did not require a survey as to where a particular wall was located. (Tr. 92-93.)

The City points to the testimony of Thomas Smith, the City's Acting Zoning Administrator, that "'property' means parcel. It means land. It means real estate. It means – just the common definition of property. It's something you own or possess. It can be your house. It can be your land." (Tr. 114-15, 138.) Smith stated that property includes unimproved property and that the removal of the term "any property" from the Zoning Ordinance in 1990 "made no real change to that

14

code [but] was just an editorial change and just a change of grammar . . . ." (Tr. 138, 143.) In addition, the common dictionary definition of "property" contemplates both improved and unimproved real estate. *See, e.g.,* MERRIAM WEBSTER'S COLLEGIATE DICTIONARY, at 935 (10th ed.) (defining "property" as "something owned or possessed; *specif:* a piece of real estate."); BLACK'S LAW DICTIONARY, at 1216-18 (6th ed.) (noting in part that "[p]roperty is either: real or immovable; or, personal or movable.")

The court agrees that "property" is generally understood to include both a building and a vacant parking lot. Such an interpretation, however, would render the term "any property" in the pre-1990 Zoning Ordinance superfluous; any advertising sign located within 75 feet of a Residence District would by definition be within 75 feet of "any property" – improved or not – within that Residence District. The City Council arguably confirmed that the "any property" language was unnecessary by enacting the 1990 amendments, but the court must give effect to all terms in a statute wherever possible. *See, e.g., In re Marriage of Lasky,* 176 Ill. 2d 75, 79, 678 N.E.2d 1035, 1037 (1997) ("[C]ourts construe statutory provisions in a manner that . . . gives full effect to each provision wherever reasonably possible."); *People v. Singleton,* 103 Ill. 2d 339, 345, 469 N.E.2d 200, 203 (1984) ("[S]tatutes should be construed so that language is not rendered meaningless or superfluous.") Under that interpretation, the term "any property" in section 8.9(5) reasonably refers only to improved property. For purposes of this decision, the court will assume that the 1962 Wall Sign did not violate the pre-1990 Zoning Ordinance. In reaching this conclusion, the court finds it significant that the City never enforced the 75-foot restriction as against the Wall Sign for over 20 years, though it was always located within 75 feet of unimproved real estate within a Residence District.

### b. Chapter 86.1

The City argues that even if the Wall Sign complied with section 8.9(5) of the Zoning Ordinance in 1962, it nonetheless violated Chapter 86.1 of the Electrical Code (section 13-20-550 of the Municipal Code). That provision made it unlawful to "proceed with the erection, enlargement, alteration or rehang of any illuminated sign or illumination of signboard unless a permit therefor shall have first been obtained from the Commissioner of Buildings." (Chicago Elec. Code § 86.1-4(a) (1962).) The Wall Sign was not illuminated in 1962 but the City notes that section 61-2 of the Building Code provided that "[o]utdoor signs shall comply with applicable provisions of this code and with the special provisions of . . . Chapter 86.1." (Chicago Building Code § 61-2 (1962).) Thomas Smith testified that in his view, a permit was required for all outdoor signs regardless of whether they were illuminated because Chapter 86.1 was found within the Electrical Code. (Tr. 122.)

It appears to the court that Chapter 86.1 applies only to illuminated signs, and as the court noted at trial, it is "a very reasonable understanding that [a person is] complying with 86.1 to the extent [a] sign is not illuminated." (Tr. 126.) The fact that the Chicago Electrical Bureau handled permits relating to non-illuminated signs as "a matter of efficiency in terms of the administration of different code requirements" in no way establishes that non-illuminated signs had to comply with the permit requirement of Chapter 86.1. (Tr. 122 (Smith).) Again, the City's failure to enforce the terms of Chapter 86.1 as against the Wall Sign supports the conclusion that they did not. The court does not find Mr. Smith's contrary testimony on this issue persuasive and finds that the Wall Sign did not require a permit pursuant to Chapter 86.1 of the Electrical Code when it was first erected in 1962.

### 2. 1962-1979

Sometime between 1962 and 1969, Heerey arranged for illumination of the Wall Sign. As noted, Chapter 86.1 required that Heerey obtain a permit prior to doing so. Plaintiffs claim that Heerey did obtain a permit, but they offered nothing to support that claim and failed to produce any

16

such permit at trial. Nor is there any evidence that the City has a record of that alleged permit. Thus, on this record the court concludes that the Wall Sign was not lawfully erected as of the date it was illuminated. Furthermore, it is undisputed that at some point between 1975 and 1979, the Wall Sign, which had previously consisted of two smaller signs, was again united into a single sign. By that time, March 25, 1970 amendments to Chapter 86.1-4 prohibited such an "enlargement" or "alteration" of a sign (and not just an illuminated sign) without a permit, which Heerey did not obtain.

Plaintiffs' only response to the City's argument that the Wall Sign is unlawful under this provision is a facial challenge to its enforcement. Specifically, Plaintiffs assert that "Chapter 86 and its related provisions constituted a prior restraint in violation of the First Amendment to the Constitution." (Pl. Br. ¶ 89) (citing *Weinberg v. City of Chicago*, 310 F.3d 1029, 1045 (7th Cir. 2002) ("Prior restraints are not per se unconstitutional, however, prior restraints are highly disfavored and presumed invalid.")) Plaintiffs object that the Municipal and Electrical Codes "gave the City unbridled discretion as to whether or not to issue a permit, as well as provided the City with no specified time period in which the City . . . had to act on a sign permit application." (*Id.*) *See also Weinburg*, 310 F.3d at 1045 (noting the two forms of prior restraint – i.e., unbridled discretion that might result in censorship and lack of time limits on licensing procedures). Plaintiffs emphasize the advertising Wall Sign's status as commercial speech, but argue only that the City failed to issue a sign permit in response to Whiteco's application in 1994, or to affirmatively deny the permit request. (*Id.* ¶ 92.)

Plaintiffs have not explained how Chapter 86.1, which at relevant times applied to all illuminated signs and not just to advertising signs, constitutes a regulation of commercial speech sufficient to implicate the First Amendment. In addition, Plaintiffs' argument is essentially a restatement of their procedural due process claim, which the court previously dismissed as untimely. *See General Auto Service Station*, 2004 WL 442636, at *5-8 (procedural due process claim which arose from the City's failure to process a sign permit in 1995 was barred by the two-year statute of

17

limitations). As for the City's discretion in deciding when and whether to issue permits for illuminated signs, Plaintiffs did not qualify for a permit under the relevant zoning laws and, thus, the delay or discretion in issuing such a permit could not have violated Plaintiffs' rights. Plaintiffs have not established that the Wall Sign was a legal, non-conforming use as of the date of illumination or, at the latest, as of the date the illuminated sign was expanded to its current size.

### 3. 1994-1995

Despite the Wall Sign's apparent disqualification, it is undisputed that, for reasons unexplained in the record, William Merritt of the City's Zoning Department approved the Wall Sign as a legal, non-conforming use in January 1995, and that he stamped Whiteco's 1994 Zoning Application as "conforms to zoning." Pursuant to the Zoning Ordinance's "grandfather clause," however, Whiteco still needed to obtain a permit in order to leave the sign in place. (1990 Zoning Ordinance § 6.7-1(a).) This required a City Council order, which Whiteco did not obtain, so the City refused to issue a permit. Plaintiffs argue that they should not have needed a permit in 1994 because they did not need a permit prior to that date when the Wall Sign was established as a legal, non-conforming use. In Plaintiffs' view, the City treated them differently than other owners of legal, non-conforming signs solely because Plaintiffs' sign did not require a permit when it was erected. For the reasons explained earlier, however, the Wall Sign was not in fact a legal, non-conforming use prior to 1994 because Whiteco never obtained the required permit prior to illuminating it, or prior to expanding it once illuminated. (Chicago Elec. Code § 86.1-4(a) (1962).)

The City has not explained why Merritt reached what appears to be a contrary conclusion in 1995. The court suspects this may have occurred because the 1994 Violation Notice cited only section 8.9(7) of the Zoning Ordinance and not Chapter 86.1 of the Electrical Code. (UF ¶¶ 32, 33; PX 1.) Indeed, the City did not issue a Violation Notice relating to Chapter 86.1 until August 1997. The court believes, however, that Merritt's conclusion was in error despite the City's failure to

18

reference one of the violated Code provisions in its 1994 notice. The Wall Sign was not a legal, non-conforming use prior to 1994 with respect to Chapter 86.1 of the Electrical Code and, thus, the City's allegedly differential treatment of owners of legal, non-conforming signs depending upon whether they had a permit is not relevant here. It is true that the City failed to pursue the 1994 Violation Notice, and that it later denied a permit for the illuminated Wall Sign in 1998 pursuant to section 8.9(7) of the Zoning Ordinance, a provision for which Plaintiffs were arguably entitled to grandfather status. (Official Denial of Zoning Certification of 4/21/98, PX 6.) Plaintiffs' lawsuit, however, is based on their objection to the City's requirement that they obtain a permit in the first place, not merely that the permit was denied. That objection, in turn, is premised on the notion that the unpermitted Wall Sign was a legal, non-conforming use. It was not, and Plaintiffs have failed to establish a violation of their substantive due process rights.

### B. Rationality of Permit Requirement

Having determined that the Wall Sign did not have legal, non-conforming status once it was illuminated and then enlarged, the court need not consider the rationality of any alleged differential treatment of owners of legal, non-conforming signs depending upon whether the signs were erected with permits.

### CONCLUSION

For the reasons stated, judgment is entered in favor of the City of Chicago on Plaintiffs' substantive due process claims.

ENTER:

Dated: April 22, 2005

REBECCA R. PALLMEYER
United States District Judge